Filed 8/31/20  P. v. Bravo CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARNULFO ESPINOZA BRAVO, JR.,<br><br>    Defendant and Appellant. | H047078<br>(Monterey County<br> Super. Ct. No. 18CR001616) |

Appellant Arnulfo Espinoza Bravo, Jr. challenges the eyewitness identification instruction given at his trial.  For the reasons explained below, the trial court did not err in giving the instruction and, even if it had, any error was harmless beyond a reasonable doubt.  We therefore affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural History*

Bravo was charged by amended information with assault with a deadly weapon upon a peace officer (Pen. Code, § 245, subd. (c); count 1), evading an officer (Veh. Code, § 2800.2, subd. (a); count 2), and misdemeanor false report of a vehicle theft (Veh. Code, § 10501, subd. (a); count 3).  Jury trial began on April 22, 2019.  The following day, the jury convicted Bravo on all counts.  On June 28, 2019, the trial court sentenced Bravo to a prison term of four years and eight months on counts 1 and 2 and sixty days

on count 3. The trial court imposed a $750 restitution fund fine (Pen. Code, § 1202.4, subd. (b)); a $750 suspended parole revocation restitution fine (Pen. Code, § 1202.45); a $120 court operations assessment (Pen. Code, § 1465.8); a $90 criminal conviction assessment (Gov. Code, § 70373); and an $8 emergency medical air transportation penalty (Gov. Code, § 76000.10).

B. *Evidence at Trial*

Scott Sutton was an officer with the Salinas Police Department. On August 21, 2017, around 7:00 a.m., Officer Sutton was driving in his patrol vehicle when he saw a black Infinity that did not stop at a stop sign. Sutton turned on his lights and siren to pull the car over, but the driver did not comply. The black Infinity sped away, and the driver committed a number of additional traffic violations, including running a red light. Sutton terminated his pursuit when he saw the Infinity was approaching a school bus.

A few minutes later, Sutton reinitiated the pursuit of the Infinity, which had reached a speed of approximately 70 miles per hour, although the maximum speed limit in the area was 35 miles per hour. Sutton was able to see that there was one person inside the Infinity, but he was not able to identify him other than as a "Hispanic male" wearing a black hat. After a few minutes, Sutton lost sight of the vehicle.

Cameron Mitchell was a police officer with the Salinas Police Department. Officer Mitchell was on duty on August 21, 2017, around 7:00 a.m. and driving a marked patrol vehicle. Mitchell heard over the radio that Officer Sutton was pursuing a fleeing car. Mitchell went to the area and located a black Infinity. Mitchell saw that the car had one occupant, a man wearing a black hat and a white shirt. Mitchell saw the man for approximately two seconds. The light was bright out; Mitchell got a "pretty good look" at the man.

Approximately one minute later, Mitchell stopped his car in the driveway of an apartment complex in an attempt to block the Infinity, which had driven into the complex. Michell got a "good look" at the man, who was wearing a black Chicago White

2

Sox hat. Mitchell made an in-court identification of Bravo as the man whom he saw inside the Infinity.

After stopping his car in the driveway, Mitchell got behind the door of his car and pointed his gun at the Infinity. The Infinity sped out of the area and would have hit the door of Mitchell's patrol car if he had not closed it and jumped out of the way. As the driver was driving past Mitchell, Mitchell saw a tattoo on the man's left arm that had "some sort of old English or Chinese lettering" on it. Mitchell saw the man for at least fifteen seconds. The situation was stressful for Mitchell. Mitchell lost sight of the Infinity around 7:10 a.m.

Around 7:30 a.m., Bravo called the police department to report that his car had been stolen. Bravo gave the police two different locations to meet with him but failed to show up at either location. Mitchell eventually met with Bravo that morning and "immediately recognized him" as the person who had been driving the Infinity earlier that day. Bravo reported that his vehicle had been stolen. Mitchell did not believe Bravo. Bravo was the registered owner of the Infinity. After Bravo made the report of the stolen car, Mitchell arrested him. Mitchell later saw Bravo's tattoo, which is in "Chinese lettering" and says " 'fuck the law.' "

Mitchell did not activate his body-worn camera when he was following the Infinity and when it almost struck him. His car's "dash cam" was not working. At trial, no one asked Mitchell how certain he was that the person he saw driving the Infinity was Bravo.

Bravo did not present any evidence at trial. In closing argument, Bravo's trial counsel emphasized that Mitchell had failed to activate his body-worn camera and had been under stress during the encounter with the driver of the Infinity. Counsel noted that there was no corroboration of Michell's testimony. Counsel told the jury "[y]ou do have a jury instruction about eyewitness identification and it's important to follow that instruction." Bravo's trial counsel also noted that Mitchell's observations occurred over

3

a short timeframe and argued that Mitchell's identification was influenced by "some prior knowledge or knowledge after the fact." In the rebuttal argument, the prosecutor stated that the case "comes down to identity. It comes down to whether the defendant was the person driving."

## II. DISCUSSION

Bravo argues that the trial court's instruction to the jury with CALCRIM No. 315, which the trial court gave without modification, violated his constitutional rights. He contends that the instruction's reference to the certainty of the witness's identification was "incorrect" because there is no correlation between certainty and the accuracy of an identification.[1] The inaccuracy of the instruction, he maintains, reduced the prosecution's burden of proof and permitted the jury to make an "irrational inference" from Officer Mitchell's testimony and therefore denied him due process of law. Bravo argues the trial court's error in giving the instruction was not harmless because Mitchell's testimony was the only evidence of Bravo's guilt. Bravo also contends his trial counsel was constitutionally ineffective for failing to object to the instruction because the instruction is "plainly incorrect."

The Attorney General responds that the California Supreme Court in a number of prior cases has rejected the argument Bravo advances. Although the California Supreme Court is considering this question in *People v. Lemcke* (June 21, 2018, G054241 [nonpub. opn.] [2018 WL 3062234]), review granted October 10, 2018, S250108,[2] the Court has not yet decided the issue. The trial court was therefore bound by existing precedent that

---

[1] In his opening brief, Bravo also requested that this court correct the abstract of judgment and sentencing minute order to reflect the restitution fine actually imposed by the trial court. Bravo has subsequently informed this court that the issue is now moot, because the trial court has corrected the error. We therefore will not further address it.

[2] In *Lemcke*, the California Supreme Court has described the question presented as: "Does instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate a defendant's due process rights?"

4

provides that the jury may lawfully be instructed to consider the certainty of an eyewitness's identification.

Further, the Attorney General maintains the instruction does not lessen the prosecution's burden of proof because it expressly states that the prosecution must prove every element of the crime, including the perpetrator's identity, beyond a reasonable doubt. Even if any error occurred, Bravo suffered no prejudice because the instruction contains a number of factors to consider, and Bravo's guilt was corroborated by other evidence.

A. *Factual Background*

With respect to eyewitness identification, the trial court instructed the jury: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation. [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] *How certain was the witness when he or she made an identification?* [¶] Are the witness and the defendant of different races? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (CALCRIM No. 315, italics added.)

5

The parties discussed the jury instructions with the trial court, but that discussion was not reported. The trial court memorialized parts of the discussion on the record but did not mention the eyewitness identification instruction. There is no indication that Bravo objected to the eyewitness identification instruction or requested the trial court modify it in any way.

B. *Analysis*

We review Bravo's challenge to the jury instruction de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The California Supreme Court has found no error in instructions similar to that given in Bravo's trial. In *People v. Sánchez* (2016) 63 Cal.4th 411, the court reaffirmed its conclusion in earlier cases that it is proper for the jury to be instructed that it may consider the certainty of the witness's identification. (*Id.* at p. 461; see also *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232; *People v. Wright* (1988) 45 Cal.3d 1126, 1141.) We disagree with Bravo's contention that *Sánchez* is distinguishable on its facts.

Unless and until the California Supreme Court decides that it is a violation of the due process clause to so instruct the jury, there was no error in the instruction given to the jury in light of these precedents.[3] (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Even if it were error to give the instruction, Bravo suffered no prejudice from the giving of the portion of CALCRIM No. 315 he challenges on appeal. Notably, the jury heard no evidence about the degree of certainty of Mitchell's identification of Bravo. Mitchell did testify that he had identified Bravo, but Bravo does not challenge the propriety of the admission of the identification. Neither party asked Mitchell about the certainty of his identification, and neither lawyer discussed this issue in their closing

---

[3] Because we reach the merits of Bravo's due process argument, we do not address his argument that his trial counsel was constitutionally ineffective for failing to object to the instruction.

argument. Instead, Bravo's trial counsel suggested that Mitchell's identification of Bravo might have been influenced by Mitchell's pre- or post-event knowledge of Bravo. Therefore, the certainty of Mitchell's identification was not at play in the trial.

In addition, Bravo's trial counsel's argument—contending that Mitchell's identification of Bravo was unreliable—was consistent with the instruction as given to the jury and similar to the contention Bravo now advances on appeal. Bravo's trial counsel urged the jury to follow the instruction on eyewitness identification, clearly suggesting that trial counsel found it helpful to the defense case. Indeed, a number of aspects of the instruction potentially called into question the accuracy of Mitchell's identification of Bravo, including that Mitchell was under stress, he saw Bravo only for a few seconds at a time, and Mitchell may have been influenced by other circumstances, including his post-event interactions with Bravo. These aspects of the instruction, undoubtedly helpful to Bravo, mitigate any prejudice flowing from the single aspect of the instruction to which Bravo objects on appeal.

Further, Bravo's contention that Mitchell's identification was the only evidence linking him to the crime is incorrect. Bravo was the registered owner of the vehicle. Bravo's odd behavior in making the stolen vehicle report undermined the credibility of his assertion that the car had been driven by someone else when the crimes were committed. The jury could reasonably discount Bravo's account.

Under these circumstances, we find any error in giving the challenged portion of the instruction harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18.)

## III.  DISPOSITION

The judgment is affirmed.

7

_____
Danner, J.

WE CONCUR:



_____
Greenwood, P.J.




_____
Grover, J.




**H047078**
*People v. Bravo*