Filed 6/9/21  P. v. Turner CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076290 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD275956) |
| JEFFREY ALAN TURNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed in part; reversed in part.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

An information filed on November 27, 2018, charged defendant Jeffrey Alan Turner with the murder of Frank Magana.  (Pen. Code,[1] § 187, subd. (a)).  The information further alleged defendant in the commission of the offense intentionally and personally discharged a firearm (i.e., a revolver), and proximately caused great bodily injury and death to a person other than an accomplice (§ 12022.53, subd. (d)); intentionally and personally discharged a firearm (§ 12022.53, subd. (c)); personally and intentionally used a firearm (§ 12022.53, subd. (b)); and personally used a firearm (§ 12022.5, subd. (a)).  The information also alleged defendant was ineligible for probation. (§§ 1203.06, subd. (a)(1) [use of a firearm] & 1203.085, subd. (a) [offense committed while on parole from a serious felony (manslaughter)].)

On April 25, 2019, the jury found defendant guilty of first degree murder and found true all four of the firearm allegations.  Defendant admitted suffering one prior conviction under the Three Strikes Law (§§ 1170.12, subd. (c)(1) & 667, subd. (e)(1)); one prior serious felony conviction (§§ 1192.7, subd. (c) & 667, subd. (a)(1)); and one prison prior (§ 667.5, subd. (b)).[2]  The court sentenced defendant to a total term of 81 years to life, comprised of a six-year determinate, followed by a 75-year indeterminate, sentence.

On appeal, defendant contends the trial court violated his constitutional rights by instructing the jury pursuant to CALCRIM No. 315

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    On February 26, 2021, on this court's own motion we obtained supplemental briefing from the parties regarding whether Senate Bill No. 136, effective January 1, 2020, applied to defendant's prior prison term enhancement and if so, whether the enhancement should be struck under newly amended section 667.5, subdivision (b).

that a witness's level of certainty is a factor to be considered in evaluating the accuracy of identification testimony. As we explain, and in light of our high court's very recent decision in *People v. Lemcke* (2021) __Cal.5th__, 2021 WL 2150610 (*Lemcke*), we reject defendant's contention and affirm the judgment.

BACKGROUND

Melissa H. testified that she knew Magana, whom she and others referred to as "Pancho," for about six years as they were friends from the same Clairemont neighborhood; that about six months before the shooting, she often would go to his house and clean; and that sometimes she would go to his house and just "hang out." Melissa told the jury that Magana knew a lot of people, and had a lot of people coming to his home, because he sold drugs.

Melissa admitted using methamphetamine and marijuana with Magana. She also admitted to being addicted to heroin, and at the time of the shooting, had been for about four years. She testified she last used heroin in September 2018, and stopped using methamphetamine about two weeks before her trial testimony.

Melissa was at Magana's house on January 3, 2018, when he was shot. According to Melissa, Magana had borrowed a car from a friend and had picked her up at about 2:00 p.m. so she could clean his home. Melissa used heroin at about 10:00 a.m. that morning, adding: "When I was doing heroin, it would make me feel just normal and—because when I wasn't on heroin, I would be sick to my stomach. It's hard to explain." She also told the jury when on heroin she felt "energetic."

Melissa testified Magana was home while she was cleaning. As she cleaned, Melissa heard Magana talking to his friend "Sammy," as Sammy owned the car Magana had borrowed and had called a few times asking for

3

its return.  Magana told Melissa more than once that he needed to go pick up Sammy.  After taking a shower and dressing, Magana grabbed his jacket, locked his bedroom door, and headed toward the front door.  Melissa then was at the back door of the house, smoking a cigarette and blowing the smoke outside, after Magana had complained about the smell.

While standing at the back door, Melissa had an unobstructed view of Magana at the front door, as the doors "fac[ed] each other."  Melissa overheard a short telephone conversation between Magana and Sammy, then saw Magana open the front door and partially open the screen door, but not fully exit the home.  Instead, Magana turned and said goodbye to Melissa who was still at the back door.

Melissa then described for the jury what occurred next:  "He [i.e., Magana] asked me if I was okay and I told him, 'Yes.'  And then I heard a voice come up and say something and he turned around and said, 'Who is that?'  And I heard somebody say, 'It's me.'  And the voice was getting closer and he—Pancho said, 'Who the fuck is me?'  And then I heard the voice say 'It's JT.'  And then Pancho said—Pancho looked back at me and he had this look on his face, and he just asked me if I was okay one more time and he checked the bottom lock and made sure it was locked.

"And then at that time I was saying 'Yes, I'm okay.'  And he goes, 'Okay, I love you.'  And I said[,] 'I love you too.'  And 'Ill make sure your house doesn't smell like cigarettes when you come back.'  At the same time -- everything happened so fast.  But at the same time I heard the voice say, 'I said it's JT.'  And then I heard the gun go off and at that same time Pancho was saying, 'Okay.  I love you.  I'll be right back.'  By the time he said, "be back,' I heard the voice say, 'I said it's JT.'  And then it went off."  Melissa

testified she heard the person say three times " 'It's JT' " in response to the victim's questions of " 'Who is that?' "

Melissa further testified she could not see who was outside when the gun went off because it was nighttime, but from the light inside the home she could see the tip of what she believed was a silver-colored gun, as Magana was standing in the doorjamb when he was shot. Melissa estimated the shooter was about three feet from Magana when he fired. Seconds before the shooting, Melissa described Magana as being "irritated" and "annoyed" by the person outside. After the single gunshot, Magana fell to the floor.

Melissa testified she recognized the voice of the man outside who referred to himself as "JT." Melissa in court identified "JT" as defendant. On further questioning, Melissa said she knew "JT" through a mutual friend named "Chris," who, according to Melissa, was nicknamed "MFC," short for "Motherfucking Chris." Melissa testified Chris and "JT" were best friends; that she first met "JT" through Chris about two years before the shooting; that she had "previously hung out with JT" and knew "JT" was short for "Jeffrey Turner," and that "JT" and another friend had picked Melissa up from the hospital after she had given birth to her daughter. Melissa testified she had had no problems with "JT" during the time she knew him, including when they would hang out with mutual friends.

After the gunshot, Melissa testified she screamed, " 'Hey' " then attempted to locate Jose, the victim's brother. She first ran to Jose's bedroom but found it locked. She next ran out the back door to the garage and banged on the door to the converted bedroom to see if Jose was inside, but again nobody answered. She then went back into the home, grabbed some of her stuff, and left through the front door. Melissa saw Magana lying on the floor. She thought Magana was dead, as he was not moving and his eyes were open.

5

When asked why she did not call 911, Melissa told the jury she was afraid "JT" would overhear her making the call, as he could have recognized her voice after she screamed. Melissa instead called "Christopher," whom she referred to as "Chico," who lived a short distance away from the victim's house. Chico earlier that day had been at Magana's home while Melissa was cleaning, and before the shooting Chico was the last person she had spoken to on her phone. Melissa told Chico about the shooting.

Melissa next located her mother, who was staying with a friend in the Clairemont area. Melissa also told her mother about the shooting. Melissa and her mother walked towards Melissa's grandmother's home, where Melissa and her family were staying, as Melissa wanted to be with her children. Along the way, Melissa and her mother saw Chico. He instructed them to go to "Gina's" home, which was on the way to Melissa's home, and remain there. Melissa and her mother went to Gina's home. Melissa told Gina and Chico's mother, who was also at the home, about the shooting. Melissa testified that Gina was "kind of upset" because Melissa had not called 911.

On further questioning, Melissa admitted she also was hesitant to call 911 because of an outstanding warrant for drug use. She also was concerned about going to jail because of her heroin addiction, and feared the police would consider her a suspect in the shooting because she knew what had "go[ne] on" in Magana's home and had run from the scene. Melissa admitted she previously had told investigators that Magana was not dealing drugs from his home because she wanted to protect him, but had finally told the truth about his drug-dealing.

As Melissa neared her grandmother's home, Chico called. He told Melissa she needed to tell police that she had been at Magana's house at the

6

time of the shooting. Melissa agreed. A short time later, police arrived at Melissa's home and took her statement. While giving her statement, Melissa saw a picture of defendant, identified him as "JT," and confirmed it was his voice she had heard seconds before the shooting.

Later that evening, Melissa went to police headquarters and spoke with detectives. Melissa again identified the shooter as "JT" based on the voice she heard outside the front door, and again identified him from a different photograph shown by detectives. Detectives asked Melissa how confident she was the person who identified himself as "JT" at the victim's door "was the same Jeffrey Turner that [she] knew." Melissa testified that she told detectives she was "100 percent" confident in her identification of the shooter. At trial, Melissa admitted she had not seen "JT" for about two years when she identified him in court as the shooter. She nonetheless reiterated the voice she heard immediately before the shooting was defendant's voice.

Melissa also testified that in the course of her friendship with Magana, she had never heard him mention "JT" or "Jeffrey Turner" or saw the two men together. However, Magana knew Chris (aka MFC), who, according to Melissa, was defendant's best friend, because the victim had told Melissa he had gone to Chris's home and would occasionally see Chris at a local neighborhood bar.

Christopher L., whose nickname was "Chico," testified he lived down the street from Magana, whom he referred to as "Tio Pancho" or "Uncle Pancho" because Magana gave him "great advice." Christopher had known Magana for about six months, and had stopped by Magana's house at about 6:00 p.m. on the day of the shooting. Christopher testified Magana then was busy helping Melissa clean. Christopher had seen Melissa, whom he referred to as "Mess," once or twice at Magana's home, but they did not hang out

7

together.  After about 45 minutes, Christopher left Magana's home, after Magana said he had to return a friend's car.  Christopher and Magana planned to meet within the hour to have dinner together.  Christopher walked to a nearby gas station to buy a soft drink.

On his way home, Christopher at 6:49 p.m. received a call from Melissa.  According to Christopher, Melissa sounded "frantic and scared" as she repeatedly told him that Magana had been shot in the head and was probably dead. On hearing that news, Christopher ran to his aunt Gina's house, which was right down the street from the victim's home.  Christopher at the time assumed Melissa had called 911.

As he approached his aunt's house, Christopher "ran into" Melissa, who was accompanied by her mother.  Christopher testified that Melissa appeared "[t]errified," as she was crying and could not stop moving.  Once at his aunt's house, Christopher told Gina and his mother about the shooting.  Melissa then informed them she had not called 911.  Christopher said to call 911 and ran to Magana's house.

On arriving at Magana's house, Christopher saw the victim "lying facedown on the floor in front of his house trying to stand up."  Christopher sat next to Magana, who rolled onto Christopher's lap.  Christopher then saw a bullet hole in the back of Magana's head.  Christopher told Magana to "hang on," as he heard sirens approaching.  While alone with Magana, Christopher asked what had happened, and who had done this, but Magana only responded, "Help me."  According to Christopher, Magana was also crying and moaning.  A few minutes later, as Magana was being put into the ambulance, Christopher testified that he heard Magana say the name "Elijah."

8

Christopher gave a statement to police, including that he had learned of the shooting from Melissa. At the request of police, Christopher called Melissa. Melissa agreed to speak with police and gave Christopher her location, who passed it on to police.

Ginger W. testified she and Magana had been "seeing" each other a short while at the time of the shooting, although she had known him for a few years. Ginger also knew defendant, who went by the name "JT," whom she identified in court. Ginger knew both Magana and defendant as a result of "hanging out in the Clairemont area."

At trial, Ginger testified she never heard Magana talk about defendant. However, she admitted previously telling detectives that Magana told her that defendant had stopped by his house; and that she had overheard Magana on the phone saying "JT [was] being a problem."

Ginger testified she had a serious boyfriend who had just gotten out of prison at the time she was "seeing" Magana. A day before the shooting, Ginger and Magana were at his house when they began to argue about her boyfriend. According to Ginger, Magana became angry and pulled a gun on her. Ginger admitted she also pulled out a weapon during the argument with Magana.

Officer Zachary Digioia of the San Diego Police Department testified he and his partner responded at 7:02 p.m. to a radio call of assault with a deadly weapon at a house on Sauk Avenue in Clairemont. First on scene, Officer Digioia activated his body-worn camera. The officers saw a man lying in the front yard of the house, who was later identified as Magana. Officers saw a blood trail near the entrance of the house leading to the man's location. The man's head was bloody. The officers rendered first aid until paramedics arrived.

9

A portion of the video from Officer Digioia's body-camera was played for the jury, and a transcript of that portion of the recording was included in the record. It describes the officers rendering first aid to Magana and trying to keep him calm; Magana "[m]oaning," "yelling," and "crying"; and the officers attempting to question Magana including asking the victim who shot him.

At one point one of the officers says the word "Eliza," and this same officer then asks the victim, "Elijah shot you? Do you know Elijah's last name?" and "Where, where did Elijah go?" At a later point, the video transcript shows another officer yelling, "Elijah, if you're inside this house, you need to come out now!" as Magana's house was being cleared.

Officer Digioia told the jury that he never heard Magana say the name "Elijah"; that he asked Magana more than once who had shot him but the victim did not respond; that he was the officer who accompanied Magana in the back of the ambulance as the victim was being transported to the hospital; that based on his body-worn camera, he was with the victim for about 23 minutes; and that during this time-span, the victim never "utter[ed] a recognizable word" including the name Elijah.

Officer Christopher Lingenhol of the San Diego Police Department testified he and his partner also responded to the scene of the shooting on Sauk Avenue. Officer Lingenhol helped other officers render first aid to Magana, as the victim was moving and the officers were attempting to keep pressure on the victim's head wound. As he tried to calm Magana, Officer Lingenhol asked the victim who had done this to him.

Officer Lingenhol testified, "I believe they answered and I heard them say something that sounded like Elijah." On further questioning, Officer Lingenhol added he was not confident the victim had said the name Elijah, and that he looked at the other officers and they "kind of put it together that,

10

like, mouthing it to each other, like, was that Elijah? [¶] We were—I was not 100 percent sure.  I tried to confirm with that individual and they did not confirm or deny that was what was said."  Officer Lingenhol also told the jury that Magana was unable to answer any of his questions in a manner that indicated the victim understood what was being asked.

Officer Lingenhol and other officers "cleared" Magana's house.  They found a "pool of blood" on the front step of the walkway, near the front door. Officer Lingenhol then was told about a potential witness to the shooting named Melissa.  He and his partner drove to a different location and interviewed Melissa.

During the interview, Melissa told the officers that she heard a voice outside Magana's front door before he was shot; that "she recognized the voice as somebody she knows"; and that in response to their request, she showed them a photograph from a social media account of the person whose voice she recognized.  Officer Lingenhol testified that person was "Jeffrey Turner."

Detective Michael Weaver of the San Diego Police Department was the lead detective in the investigation.  He worked side-by-side collecting evidence at Magana's home with a crime-scene specialist.  On the floor in the middle of the living room/hallway they found a "fired projectile," with a "defect in the drywall directly above [it]."  Detective Weaver added, "The defect was essentially a scoring along the drywall I would call it two to three inches in length and almost precisely above the center of the living room," near the front door.  They also found "drywall dust" "directly under the defect and it was captured by [a] dark-colored sofa," which, according to Detective Weaver, made it "easy to spot."

Detective Weaver testified they measured the distance between the back door, where Melissa had been standing in the doorjamb, to the front

11

door, where Magana had been exiting the home when he was shot. They found it was about 21 feet apart and there was an unobstructed view between the two doors. They also found a blood stain on the interior of the screen door, where Magana had been standing; and a blood droplet or smudge on the floor in the interior of the house, near the front door.

The following morning, Detective Weaver learned that defendant had been arrested at a house on Tipton Street in San Diego. Later that day, Detective Weaver along with several other officers conducted a lawful search of that home. From that search, police found evidence that defendant resided in a converted bedroom, located in the garage off the main house. On the floor of the converted bedroom police found a "black boot with an item shoved down inside of it wrapped in a black t-shirt with red and white writing."

Detective Weaver testified that on further inspection and without manipulating the boot in any way, he could see a "glimmer of something silver in between the layers of cloth through the boot." After the boot was secured, inside police found an unloaded silver Smith & Wesson revolver.

The Tipton Street home had eight externally mounted cameras that recorded to a digital system located in the master bedroom. As part of the search warrant, police accessed the system and downloaded surveillance video for the 24-hour period beginning in the afternoon on January 3, 2018.

The video showed defendant at about 2:10 p.m. sitting in the backyard smoking a cigarette. A few minutes later, the video shows defendant wearing a black T-shirt. At about 2:45 p.m., the video from another camera showed defendant walking across the street, getting into a car registered in his name, and driving away.

Detective Weaver reviewed the video for the next five hours after defendant had left home. It showed the homeowners where defendant lived

12

coming and going, but at no time during this five-hour period did it show defendant at home.

Of interest to Detective Weaver, between about 7:00 and 7:30 p.m., the video showed the homeowner, Clayton G., talking on his cellphone, pacing back and forth in the front of the house, and, based on the "frenetic motions of his hand," appearing "irritated or upset." Thereafter, Detective Weaver noticed that homeowners Clayton and his wife Holly G. at around 8:28 p.m. began to "manipulate[] every single camera on the eaves of the house to record something mundane: the side of the house, a shrub. Anything but the original azimuth [i.e., angle] of recording that it was set at."

In one instance, the video showed Clayton at around 8:40 p.m. holding a flashlight, looking into one of the surveillance cameras, and moving the camera. Other portions of the video showed Clayton shining the flashlight directly into another camera while appearing to talk on his cellphone. The video also showed Clayton at about 8:37 p.m. adjusting or "manipulating" for a second time a certain camera, with that camera "go[ing] black" less than a minute later and then recording shrubs.

At about 8:50 p.m., the video showed headlights of an approaching car, and the car park. A man later identified as defendant got out of the car and walked toward the Tipton home. Defendant was wearing a baggy T-shirt, jeans, and a hat that was backwards with a square label on its bill. Detective Weaver testified this same hat was subsequently recovered during one of the lawful searches of defendant's bedroom. Shortly thereafter, another camera recorded defendant in the backyard of the home. According to Detective Weaver, this camera showed a "black object" tucked into defendant's waistband.

13

Detective Weaver testified that after defendant returned home, other cameras were then manipulated "back into place"; that Holly manipulated several of these cameras, as once the cameras were moved back to their original position the video showed her walking into the foreground; and that the camera, which earlier in the day had recorded defendant sitting and smoking a cigarette, had also been moved, as the camera captured different views of the backyard as compared to earlier video footage.

One of the backyard cameras recorded flames coming from a firepit at about 9:14 p.m. Next, it recorded defendant coming into view. Detective Weaver described defendant's actions as follows: "He took a knee. He bowled a strike, he took another knee, he raised his hand outward and upward at about a 45-degree angle in a salute, and now he is pivoting at 45-degree angles, essentially doing military-style right faces. [¶] And he just raised his hand three more times in that same outward upward 45-degree salute."

Detective Weaver testified that the footage from all eight cameras was entirely missing between 8:39 and 8:48 p.m., either because the "recording was paused, or it was outright deleted." The detective noted defendant already had arrived home when the system stopped recording during this nine-minute period.

A crime scene specialist testified she processed the silver revolver recovered from defendant's bedroom. Inside one of the chambers of the cylinder she found a "red-brown stain" or mixture that she swabbed for DNA testing. The crime scene specialist also collected some trace evidence or "debris" from the frame of the revolver. She attended the autopsy of Magana and received part of a bullet with a copper jacket that had been recovered from the victim.

14

DNA testing of the red-brown stain indicated defendant contributed 92 percent of the mixture and the victim 7 percent, with a third unknown individual contributing less than 1 percent to the mixture. With respect to the victim's DNA found in the mixture, it was determined that it was "1.04 times 10 to the 22 times more likely that Frank Magana contributed DNA to this mixture than if he did not contribute DNA to this mixture." Defendant's DNA was found on the outside of the revolver and on the black T-shirt that was wrapped around the revolver, and it was determined he was the sole contributor of DNA on these items.

Paramedic Oscar Aguirre testified he was on duty in the evening of January 3, 2018, and was dispatched to the shooting location. On arrival at 7:12 p.m., Aguirre found the victim was making grunting noises, but was neither talking nor tracking. Aguirre, along with a police officer, rode in the back of the ambulance with the victim.

On the way to the hospital, Aguirre held a pen light to Magana's eyes and found they reacted "[v]ery minimally" to light. During the drive to the hospital, the victim also did not make any specific statements or say any words that Aguirre understood to be actual words.

At the hospital emergency room, Magana was evaluated by Dr. Frank Coufal, a neurosurgeon. Dr. Coufal reviewed a CT scan of the victim's head and found evidence of a bullet entry to the lower left of the victim's brain, which then crossed over the midline to the opposite hemisphere. Along the trajectory there were bone fragments and acute hemorrhage with substantial bleeding within the deeper ventricles of the victim's brain. Dr. Coufal testified that if an individual suffers a brain injury similar to the victim, he or she typically has a "poor prognosis for recovery"; that over the course of the following week the victim continued to show signs of significant neurologic

15

injury; and that the victim thereafter was transferred to another hospital and had died within a week.

Dr. Coufal opined in all medical probability that the injury to the victim's brain "would have affected language function to some degree," inasmuch as the entry of the projectile was through the left side of the victim's brain, which Dr. Coufal noted is the dominant hemisphere that controls language function.

Abubakr Marzouk of the San Diego County Medical Examiner's Office performed the autopsy. An x-ray revealed a projectile lodged in the left side of the victim's brain, which was recovered during the autopsy and turned over to law enforcement.

Dr. Marzouk also examined a piece of the victim's skull that had been surgically removed to relieve the pressure on the victim's brain. It showed an entrance wound and "black discolorations" in the interior, which Dr. Marzouk explained was soot from the burning of powder when a gun is fired at close range. Dr. Marzouk estimated the victim's head was within inches of, and likely no more than one or two feet away from, the gun barrel. Dr. Marzouk determined the victim's cause of death was homicide from the gunshot wound.

The projectile recovered during the autopsy fit inside the projectile fragment found on the victim's living room floor. The prosecution's expert opined that the two projectile fragments "were of a common source" and made up one bullet. The expert then compared the two pieces of the projectile to test-fires from the gun recovered from defendant's bedroom. Based on the markings from the one bullet, the expert opined to a "practical certainty" that the bullet was fired "by the Smith & Wesson revolver" recovered from defendant's bedroom.

16

The prosecution expert also was asked about soot. He explained soot as fine particles of explosive compound that a gun emits when fired. He explained that soot particles "generally travel a maximum eight inches away from the skin to ten being maximum," as determined by the distance from the end of the gun barrel to the victim's body. Because soot was found on the inside of the victim's skull but not on skin outside the skull, the expert opined that "would be consistent with contact or near contact" between the barrel of the gun and the victim's head.

DISCUSSION

I

<u>CALCRIM NO. 315</u>

Defendant in his opening brief[3] contends his due process rights were violated when the trial court instructed the jury with CALCRIM No. 315 because that instruction told the jurors to consider an eyewitness's level of certainty when evaluating the identification testimony. The instruction specifically recommended the jurors consider the following, which we sometimes refer to as the "certainty factor": "How certain was the witness when he or she made an identification?"

Specifically, defendant contends that there is no correlation between certainty and accuracy; that Melissa, the prosecution's principal witness, was a long-time heroin addict who defendant claimed was "wholly unreliable" and who identified defendant as the shooter "based on her recollection of [defendant's] voice, even though she was only casually acquainted with [him]"; and that, in violation of his rights to due process of law, she testified she was "100 percent" certain the voice she heard was defendant's voice.

---

3      Defendant's contention predated *Lemcke*.

17

Defendant also contends that his defense counsel's failure to object to or seek modification of the certainty factor did not forfeit his claim of error on appeal.

A. *CALCRIM No. 315 and the Certainty Factor*

The jury was instructed with CALCRIM No. 315 as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see or hear the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, or hear such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] *How certain was the witness when he or she made an identification?* [¶] Are the witness and the defendant of different races? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

18

B. *Forfeiture*

As noted, defendant admits that he did not ask the court to modify CALCRIM No. 315 to remove the challenged certainty factor language. The Attorney General argues that defendant's failure to request modification forfeited his challenge on appeal. We agree with the Attorney General.

In *People v. Sanchez* (2016) 63 Cal.4th 411, 461–462 (*Sanchez*), our high court considered the defendant's argument that because there was "at best, a weak correlation between . . . certainty and accuracy," the trial court erred in instructing the jury with CALJIC No. 2.92,[4] the CALJIC equivalent to CALCRIM No. 315. Our high court stated: "The Attorney General argues the claim is forfeited because defendant did not request that CALJIC No. 2.92 be modified. *We agree.* If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so. [Citations.]" (*Sanchez*, at p. 461, italics added.) We are bound by our high court's holding in *Sanchez*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).) We therefore conclude defendant forfeited his claim of instructional error by failing to seek modification of CALCRIM No. 315 in the trial court.

---

4      As given in *Sanchez,* CALJIC No. 2.92 provided, in relevant part: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including but not limited, to any of the following:. . . .'[T]he extent to which the witness is either certain or uncertain of the identification . . . .' " (*Sanchez, supra*, 63 Cal.4th at p. 461, fn. 7.)

C. *Analysis*

Reaching the merits,[5] we review de novo whether CALCRIM No. 315—and the certainty factor in particular—correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In so doing, we presume that jurors are "able to understand and correlate instructions" and "have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Our high court just recently rejected a defendant's due process claims based on CALCRIM No. 315 and the certainty factor, finding that when considered as one of the 15 factors the jury may consider when evaluating identification testimony, this particular factor did not render the defendant's trial fundamentally unfair. (*Lemcke, supra*, WL 20150610, at p. *1.) Despite the absence of a due process violation, the *Lemcke* court found that reevaluation of the certainty instruction was warranted and directed trial courts to omit this factor from CALCRIM No. 315 pending further clarification from the Judicial Council and its Advisory Committee on Criminal Jury Instructions. (*Ibid.*)

In reaching its decision in *Lemcke*, our high court relied on prior case law in which it repeatedly approved in CALJIC No. 2.92 language nearly identical to the certainty factor in CALCRIM No. 315. (See *Lemcke, supra*, WL 20150610, at pp. 15–17, citing *Sanchez, supra*, 63 Cal.4th at pp. 461–462;

---

5    Because we consider the merits of defendant's instructional error claim, we decline to consider his alternate contention that counsel was ineffective for failing to object to the certainty factor language in CALCRIM No. 315. However, even assuming counsel's performance was deficient, as we explain *post* defendant suffered no resulting prejudice. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [noting in addition to showing counsel's performance was deficient, a defendant "must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different"].)

*People v. Johnson* (1992) 3 Cal.4th 1183, 1230–1232 (*Johnson*); and *People v. Wright* (1988) 45 Cal.3d 1126, 1143–1144 (*Wright*).) In *Sanchez,* the jury was instructed to consider a witness's certainty in making an identification. (*Sanchez,* at p. 461.) On appeal, the defendant, much like our defendant in the instant case, relied upon "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy," and argued the trial court "erred in instructing the jury it could consider the certainty factor." (*Ibid.*)

After finding, as we have noted, the defendant forfeited this claim by failing to request modification of the instruction, the *Sanchez* court concluded there was no error in giving the instruction, and no prejudice in any event. (*Sanchez, supra,* 63 Cal.4th at p. 462.) The court observed that studies suggesting a weak correlation between witness certainty and accuracy were "nothing new," adding that *Wright* "specifically approved CALJIC No. 2.92, including its certainty factor," and *Johnson* "reiterated the propriety of including this factor." (*Sanchez*, at p. 462.) The *Sanchez* court declined to reconsider the propriety of these previous holdings. (*Ibid.*)

In the instant case, as was the case in *Sanchez*, the certainty factor in CALCRIM No. 315 was presented in a neutral manner and did not equate the certainty of a witness's identification with its accuracy, despite defendant's contention otherwise. (See *Sanchez, supra*, 63 Cal.4th at p. 462.) In addition, the certainty factor was only one of more than a dozen factors offered for the jury's consideration, and it did not advise the jurors what weight, if any, to assign to Melissa's confidence that it was defendant's voice she heard outside Magana's front door seconds before the shooting.

Indeed, the defense during closing aggressively argued that no weight should be afforded Melissa's identification because up until two weeks before

trial, she had been using methamphetamine, while at the same time claiming she was sober. The defense further argued at the time of the shooting, Melissa admitted she had been addicted to heroin for about four years, and had used heroin on the morning of the shooting before going to Magana's house to clean. The defense argued Melissa's drug use, and her being under the influence of heroin at the time of the shooting, made her identification of defendant untrustworthy.

The defense also argued Melissa was not credible because she did not call 911 to report the shooting. The defense noted that Melissa later admitted one of the reasons she had not called 911 was because she had an outstanding warrant; that, according to the defense, Melissa, like all drug users, was a liar because drug addicts are untruthful when they say they are not using and are sober, when in fact they are using and lying about it; and that Melissa falsely accused defendant because she wanted to "get the heat off of her" and avoid prison, where it would be difficult for her to obtain heroin.

The defense in closing also argued Melissa's identification of defendant was not credible because she did not know defendant well, as he was more of a "friend of a friend"; and, at the time of the shooting, she had not seen him for about two years. In the end, it was the jury's responsibility to decide the weight, if any, to give Melissa's identification of defendant as the shooter, based on the myriad factors set forth in CALCRIM No. 315, and not just because Melissa testified she was "100 percent" certain the voice she recognized was the voice of defendant.

In light of *Lemcke* and its progeny, we reject defendant's claim that he was deprived of due process of law as a result of the inclusion of the certainty factor in CALCRIM No. 315. (See *Auto Equity Sales, supra*, 57 Cal.2d at

22

p. 455.)  As such, we find unavailing defendant's reliance on various studies and out-of-state authorities to support his claim the certainty factor in CALCRIM No. 315 violated his right to due process of law.

But even assuming the certainty factor instruction was erroneous, we conclude in the instant case that any such error was harmless.  (See *Sanchez, supra,* 63 Cal.4th at pp. 462–463 [applying the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) in determining whether the court erred in instructing the jury that it could consider the certainty factor in CALJIC No. 2.92]; *Wright, supra,* 45 Cal.3d at p. 1144 [analyzing instructional error under the *Watson* harmless error standard].)

Indeed, as summarized *ante* the record shows at about 8:28 p.m. on the night of the shooting Clayton and Holly manipulated *all* eight external cameras at the Tipton property where they and defendant resided, after one of the cameras captured Clayton having what Detective Weaver described as an animated conversation on his cellphone.  Despite attempting to adjust the cameras to record "mundane" things such as shrubs, one of the cameras in front of the home recorded defendant arriving home at about 8:51 p.m., and another camera located in the backyard thereafter showed defendant with a black object tucked into his waistband.  The following day, police found a revolver wrapped in black clothing in defendant's boot while conducting a lawful search of his bedroom.

Testing of the revolver recovered from defendant's bedroom showed to a "practical certainty" that the bullet that killed Magana was fired from this weapon.  In addition, testing of the "red-brown stain" found inside one of the revolver's chambers showed it was "1.04 times 10 to the 22 times more likely" than not Magana's DNA, as the victim was shot at very close range as evidenced by the soot inside the interior of his skull.

Moreover, the record shows that defendant and Magana knew each other; that a few weeks before the shooting, Magana had told his friend Ginger that defendant was "being a problem" after defendant had stopped by Magana's house; and that on the night of the shooting, one of the backyard cameras recorded defendant "celebrating" by a firepit about two hours after the shooting.

On the record before us, we conclude there is no reasonable probability that defendant would have obtained a more favorable result had CALCRIM No. 315 been modified to omit the certainty factor. (See *Sanchez*, *supra*, 63 Cal.4th at p. 463; *Wright*, *supra*, 45 Cal.3d at pp. 1144–1145.) For this separate reason, we therefore reject defendant's claim of instructional error.

II

Newly Amended Section 667.5

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b) regarding prior prison term enhancements. (See Stats. 2019, ch. 590, § 1.) Former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances.

However, newly amended section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b); see *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 [noting "[b]y eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses"].)

24

Here, the parties in supplemental briefing agree that defendant's prior prison term was not for a sexually violent offense as defined under Welfare and Institutions Code section 6600, subdivision (b). Because defendant's case is not yet final, we agree with the parties that Senate Bill No. 136 applies retroactively to him (see *In re Estrada* (1965) 63 Cal.2d 740); and therefore, that his one-year prior prison enhancement must be stricken.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment striking the one-year prison prior imposed on defendant under former section 667.5, subdivision (b), and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.

25